## McINTYRE *v.* BARNARD.

An instrument was executed in 1836, by which M. granted, bargained and sold to
    C. and H. all the pine timber standing on a tract of 6832 acres of land; *habendum*
    to them, their heirs, &c., together with the right of entering upon the land until
    January 1, 1841, to cut and remove the timber. It was held to be a grant of all
    the pine timber which should be removed from the land by the first of January,
    1841, and that after that day the grantees had no interest or right in the standing
    pine timber.
Standing trees will not pass by such an instrument, unless it be sealed.
    Albany, July 18; New-York, Aug. 14, 1843.

THE suit was brought to obtain a perpetual injunction
against cutting and removing timber on the complainant's land;
and for an account of such as had been cut and removed after
January 1, 1841.

The defendant claimed an absolute right to all the pine tim-
ber on the land, under a conveyance, which with the other
facts, will be found stated in the opinion of the court.

*L. H. Palmer,* for the complainant.

*S. Stevens,* for the defendant.

THE ASSISTANT VICE-CHANCELLOR.—I have had much
difficulty in coming to a conclusion upon a construction of the
instrument in question in this cause. By its terms, the com-
plainant's agent in the first instance, in consideration of $600
paid to him, granted, bargained and sold to Cadwell & Harris,
and to their executors, administrators and assigns, *all the pine*

———

*timber standing or being* on the premises. Then follows an *habendum* of pine timber to them and their heirs, executors, &c., " *together with the right of entering upon the land un-* " *til January* 1, 1841, *to cut and remove the said timber.*" The contract was made on the 27th day of May, 1836. The land described in it contains 6832 acres, and the defendant concedes that there were 75,000 standard pine logs upon the land at that time. His mode of answering as to the value of the logs, is such as to leave me in doubt upon that point. The bill charges that there were 150,000 standard pine logs on the lot, worth standing, over twenty cents each on an average. This is denied *totidem verbis*, and in the form of a negative pregnant, so that it does not meet the allegation of value. He then states on his information and belief, that all the logs upon the premises at that time, were not worth to exceed $600. It would have been more satisfactory if he had answered specifically the allegation in the bill, for I can scarcely conceive that pine logs in any part of the state within reach of the lumber-men, were worth in 1836, less than a cent each. In answering another clause of the bill, viz., that the defendant, previous to 1841, had taken off 30,000 pine saw-logs of the value of $6,000, the defendant traverses the charge in the same evasive manner, and then proceeds to say that he had taken off only about 9,000 pine saw-logs, without answering at all as to their value. I might perhaps justly infer from this evasion of the point, that there was a striking disparity between the value of all the timber on the premises, and the $600 paid upon the sale to Cadwell & Harris. But this fact was one susceptible of proof, and the complainant should have clearly exhibited it, if the allegations in the bill are true. As the case stands, but little light is thrown upon the transaction from this source.

It is agreed on both sides, that the land is of very small value, exclusive of the timber upon it. This is urged by the defendant in answer to the argument *ab inconvenienti*, which is hereafter alluded to. But then, on the other hand, what possible motive could there be for these parties to separate the land from the timber growing upon it, (the land itself being comparatively valueless,) when they were making a transfer of all the timber,

of all that constituted *value* in respect of it? An instrument, with the formality of a bargain and sale, was executed by the parties. Why did they not simply insert the land itself, instead of the timber upon the land? Why, when the mere soil was so little worth, did they continue the title of it in the complainant? And above all, why annex to it the *right of litigation*, if I may so speak; the right to sue in trespass for every entry upon the land after 1840 for the purpose of removing the timber; the whole object of the purchase, almost the whole value of the estate? At the rate in which the timber has been removed thus far, and assuming the defendant's estimate of its quantity, it would require more than thirty years from 1836 to take it all off. At the end of that time, the timber being removed, the land would not probably be worth the intervening taxes and interest thereon to that period. By whom did the parties expect that these taxes would be paid, so as to protect the land and timber from a sale by reason of their non-payment? If the timber were all granted, and granted forever, the defendant may be 300 years, instead of thirty, in taking it off. It inevitably results in making the right of soil, not merely of little value, it destroys its value entirely. And the court should require very clear and convincing evidence of such an intention of the parties, before it gives credit to its existence. In this instrument we certainly find such an intent clearly expressed, and unqualified, until we reach the *habendum*. The conveyance was perfect without that clause. It was strictly *technical*, because the word "*heirs*" was omitted in connexion with executors, &c. The trees, after the transfer, would not go to the *heirs* of the grantee. Then we have the *habendum*, and the expression, "together with the right of entry, &c., till January, "1841." It is admitted, that if this clause had not been inserted, a right of entry would have passed by the instrument, commensurate with the removal of all the timber. Why then was it inserted? The parties could not have designed to subject the grantees to actions of trespass, in removing their own property from the premises. The complainant could not have stipulated for such an absurd proposition, nor the grantees have assented to it. Nor is it credible that the parties expected the

whole of the pine saw logs, 75,000 in number, to be removed by January, 1841.

The conclusion most satisfactory to me is, that the clause in question was designed to limit the whole grant ; and that the object of the grant was the sale of all the pine logs, which should be taken off by January, 1841, and nothing beyond that. The complainant's agent, doubtless, supposing it to be impracticable for the grantees to remove one quarter of the timber within the stipulated period, and the grantees, relying upon their own diligence and exertions to get off all that they could, and thus enhance the profit of the enterprise. It is only by this construction, that we can give full scope to the *whole intention* expressed by the instrument ; and at the same time we relieve it from the irrational consequences to which the defendant's construction inevitably leads.

Two cases in Maine, the greatest lumber state in the Union, support this view of the instrument. In one of them, *Pease v. Gibson*, (6 Greenl. 81,) the contract was in this form :—" I " hereby agree to let J. H. have all the pine trees fit for mill " logs on my land in Brownfield," (describing it,) " said H. to " have two years from date to take off said timber. I acknow- " ledge $150 for the same." It was held to be a sale of only so much of the timber as the vendee might take off in the two years.

The other case is *Howard* v. *Lincoln*, (13 Maine R., 1 Shepley, 122.) There the plaintiff sold to one Smith, "all the white " pine and hard pine timber fit for board logs, &c., which are " now standing, lying or being on, &c.," (describing the land,) " the said Smith to have the term of three years from the date " hereof, to haul the said timber." The court decided that it was a sale of the timber which the vendee might remove in the three years, and no more.

See also *Sacheveril* v. *Day*, (Poph. R. 193. S. C. in Latch's R. 163. 268.)

The instrument in question is drawn as if to be sealed by the vendors, but in the copy set forth, the names are signed without any *locum sigilli.* I understood at the hearing, that the instrument was not sealed. It is with diffidence that I suggest

a point not pressed on the argument, but if in fact, there were no seals attached, it would seem that no title to the trees passed to the grantees. Doubtless, *after a grant* of growing trees to one who has no interest in the soil, the trees become personal property. That was one of the many points said and ruled in *Richard Liford's Case*, (11 Reports, 46.) But *before the grant*, it is equally clear, that they are realty, and as such can be granted only by deed. It was said, in *Liford's Case*, just cited, to have been resolved, both in 9 and 15 Eliz., that if a man, by deed indented ; granted, bargained, sold, &c., his manor of D., and *all his trees growing thereon*, to another, and the deed is not enrolled according to the statute, the trees would not pass so as to be severed, although granted by express words, forasmuch as the manor will not pass. If the trees could pass without deed, the want of enrolment in that case, would not have affected the validity of the grant of the trees. The court say, in *Liford's Case*, that " the law doth not favor fractions and " severances of trees from the freehold and inheritance of the " land."

On both grounds, I deem the complainant entitled to the relief sought. There must be a perpetual injunction against felling more timber, and against removing timber which has been cut since January 1, 1841, and the defendant must account for the timber cut, and other waste done since that date. He must also pay the complainant's costs.